785 So.2d 155 (2001)
STATE of Louisiana, DEPARTMENT OF SOCIAL SERVICES in the Interest of D.L.F., Plaintiff-Appellee,
v.
Darla PHILLIPS, Defendant-Appellant.
No. 34,645-JAC.
Court of Appeal of Louisiana, Second Circuit.
April 4, 2001.
*156 Elizabeth C. Brown, West Monroe, Counsel for Appellant.
Susan E. Skidmore, Monroe, Counsel for Appellee, State of Louisiana, Department of Social Services.
Deal & Cook by Ronald K. Cook, Monroe, Counsel for Appellee, D.L.F.
Before WILLIAMS, PEATROSS and KOSTELKA, JJ.
WILLIAMS, Judge.
The defendant, Darla Phillips, appeals a judgment terminating her parental rights to the minor child, DLF. For the following reasons, we affirm.

*157 FACTS AND PROCEDURAL HISTORY
DLF was born on December 21, 1996 to Darla Phillips and Paul F. On March 31, 1997, the State of Louisiana, Department of Social Services ("DSS") received reports that DLF was being subjected to substandard living conditions.[1] On April 1, 1997, as a result of a petition filed by DSS, the trial court issued an oral instanter order removing the child from his parents' custody and placing him in the custody of the Office of Community Services. DLF was returned to his parents six days later on April 7, 1997. On May 7, 1997, DSS received complaints of physical abuse and lack of supervision regarding DLF. The defendant allegedly kicked DLF, knocking him into a cupboard. As a result, DLF suffered lacerations to the forehead which required stitches. Once again, the trial court issued an oral instanter order removing DLF from the custody of his parents. At the time of this proceeding, DLF had been in the continuous care and custody of DSS since May 7, 1997, over two years.
DSS developed a case plan designed to rehabilitate the parents so that they eventually could be reunited with their child. The plan called for the parents to attend parenting and counseling sessions, maintain contact with DLF through family visits or telephone calls, maintain contact with DSS, allow DSS employees to visit them in their home at least twice a month and maintain a clean, safe and orderly home.
On September 27, 1999, pursuant to La. Ch.C. art. 1004, DSS filed a petition for termination of parental rights and certification for adoption against Darla and Paul[2] alleging that they had failed to comply with the case plan.
After a trial, the court ordered that all parental rights and obligations of Darla Phillips and Paul F. to DLF be terminated. The court also certified DLF for adoption. Darla Phillips appeals.

DISCUSSION

Assignment of Error No. 2
By this assignment, the defendant contends that the trial court erred in terminating her parental rights. According to the defendant, she substantially complied with the conditions of her case plan which makes her eligible to regain custody of DLF.
In termination of parental rights cases, the trial court's factual findings, including whether a parent is unfit and whether there is a reasonable expectation of reformation, will not be set aside in the absence of manifest error. State in Interest of KLB v. Biggs, 29,512 (La.App.2d Cir.2/28/97), 690 So.2d 965; State in Interest of S.D. v. Moore, 31,192 (La.App.2d Cir.8/19/98), 717 So.2d 265. The termination of parental rights, except when the petition alleges certain criminal or grossly negligent conduct, requires proof by clear and convincing evidence. La.Ch.C. art. 1035; State in Interest of D.G. v. Danny G., 30,196 (La.App.2d Cir.10/29/97), 702 So.2d 43. The State need only sustain that burden under one applicable subsection or paragraph of La.Ch.C. art. 1015, the statute that governs the termination of *158 parental rights. State in Interest of D.G. v. Danny G., supra.
La.Ch.C. art. 1015(5) provides:
Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.
La.Ch.C. art. 1036(C), provides that lack of parental compliance with a case plan may be evidenced by one or more of the following:
(1) The parent's failure to attend court-approved scheduled visitations with the child.
(2) The parent's failure to communicate with the child.
(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
The State must prove that the parent is unfit to retain parental control and that there is no reasonable expectation of reformation in the foreseeable future in order to obtain termination of parental rights when the child has been removed from the parent's home. State in Interest of D.T. v. K.T., 29,796 (La.App.2d Cir. 6/18/97), 697 So.2d 655. Lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by any physical or mental illness, mental deficiency, substance abuse or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior. La. Ch.C. art. 1036(D)(1).
Drs. Tony Young, Sally Thigpen and Bobby Stephenson, experts in psychology, examined the defendant and performed several psychological evaluations to determine her ability to function as a parent. The evaluations revealed that the defendant suffered previous injury or insult to her central nervous system which caused impairment in her motor skills and her ability to conceptualize and remember. It was also noted that the defendant had difficulty controlling her emotions. Drs. Young and Thigpen observed the defendant in the presence of her children and noted that the defendant did not display nurturing characteristics. According to Dr. Young, DLF "was no more attached to... his mother than to ... a total stranger." Taking into account the defendant's level of intelligence, damaged neurological system and age, the doctors agreed that there is little chance that she could be rehabilitated. They also concluded that counseling would have little, if any, effect *159 in improving her condition. In particular, Dr. Stephenson concluded that the defendant is characterized as a slow learner in the mild, mentally handicapped range with significant limitations.
The State also presented the testimony of employees of the Ouachita Parish Office of Community Services ("OCS") and Family Matters[3] to support its contention that the defendant was unable to function as a parent. Lou Ann Prince, social service supervisor with OCS, testified that her agency began providing services to the defendant in December 1997, approximately one week after DLF was born. According to Ms. Prince, OCS had custody of the defendant's older child, Joshua, and as is its policy, the agency developed a service plan to meet the needs of children who remained in the home. The plan was designed to demonstrate basic living skills, housekeeping skills and infant care, with instruction to be provided in the defendant's home. Ms. Prince testified that initially, the defendant was motivated, cooperative and expressed a desire to participate in the plan because she wanted to retain custody of DLF. However, according to Ms. Prince, when DLF was approximately two and one-half months old, the defendant became less patient with him and her level of frustration increased as the child aged. According to Ms. Prince and Ms. Romana Greer, a social worker, during a family visit, after DLF had been placed in the custody of OCS, DLF was attempting to climb onto a bookshelf when the defendant took him down and "slung" him approximately four feet across the room.
Ms. Greer also testified that she personally provided transportation for the defendant to attend scheduled visitations with DLF. According to Ms. Greer, the defendant "would never be ready" when she arrived to pick her up for visits and on most occasions, the defendant had to be encouraged to attend the visits. Ms. Greer further testified that, when they had arrived for the visit, the defendant had to be prompted to interact with DLF.
Lori Traweek, Social Services Specialist II Case Manager with OCS, was the defendant's case manager regarding her son, Joshua, from June 10, 1995 until February 26, 1996, and again from April 2, 1997 until March 1998. Ms. Traweek testified that counseling sessions designed to address parenting issues were scheduled for the defendant as a part of her rehabilitation. Ms. Traweek further testified that, although the defendant was informed of the scheduled appointments and transportation was provided, when her transportation arrived, the defendant would not be ready, she would be asleep or would claim that she was not aware that counseling was scheduled for that day. According to Ms. Traweek, after the defendant missed three consecutive sessions, the remaining sessions were canceled. Ms. Traweek testified that most of the time she had to "push" the defendant to get her to cooperate with any activities regarding counseling, parenting classes, keeping appointments at the health unit or any other type of appointment that may have been scheduled to help her better care for DLF.
Andrea Savage, a guide at Family Matters, provided individualized parenting sessions with the defendant in the defendant's home. Ms. Savage testified that the defendant was not cooperative and on some occasions, she would not be home for scheduled visits. Ms. Savage provided sessions to help the defendant develop her parenting skills; however, the defendant *160 did not appear capable of grasping and retaining the information discussed during the parenting classes. Ms. Savage testified that she often questioned the defendant regarding the information discussed but the defendant could not communicate any of the information discussed in the parenting session. According to Ms. Savage, the defendant would often respond, "I forgot."
We agree with the trial court in its conclusion that the defendant failed to comply with the case plan, specifically as it relates to counseling, and that there was no evidence of improvement of the defendant's parental abilities during the period that DLF was in the custody of the State. The evidence presented in this case establishes that the State made every reasonable effort at reunification. Furthermore, the evidence establishes that the State has met its burden of proving by clear and convincing evidence that the defendant, Darla Phillips, is unfit to retain parental control and there is no reasonable expectation of reformation in the foreseeable future. Accordingly, we conclude that the trial court was not manifestly erroneous in its decision to terminate the defendant's parental rights.

Assignments of Error Nos. 1 & 3
The defendant was charged with a criminal offense after she allegedly kicked DLF, knocking him into a cupboard. By Assignment of Error No. 1, the defendant argues that the trial court erred in denying her motion to exclude testimony by Ms. Prince concerning Prince's conversation with the defendant when the defendant admitted to committing the act because Paul was paying more attention to DLF than he was to her. According to the defendant, although she was represented by counsel, Ms. Prince questioned her regarding the incident outside of her attorney's presence. Therefore, Ms. Prince should not have been allowed to testify as to any statements made by the defendant regarding the incident.
In Assignment of Error No. 3, the defendant argues that the trial court erred in allowing Dr. Thigpen to testify at trial because she never observed the defendant and DLF together and Thigpen's evaluations of the defendant were conducted in reference to the defendant's son, Joshua. Concluding that Dr. Thigpen's testimony "goes more to the weight [of the evidence] than the admissibility," the trial court allowed the testimony.
La.Ch.C. art. 1034(D) provides that:
Testimony or other evidence relevant to the abuse or neglect of a child or the cause of such condition may not be excluded on any ground of privilege, except in the case of communications between an attorney and his client or communications between a priest, rabbi, duly ordained minister, or Christian Science practitioner and his communicant.
Since none of the exceptions to this Article are present in the instant case, we find that the trial court did not err in denying the defendant's motion to exclude Ms. Prince's testimony regarding the defendant's explanation of the circumstances surrounding defendant's physical abuse of DLF.
Dr. Thigpen's psychological evaluation of the defendant was conducted regarding her relationship with her son Joshua. However, the purpose of the evaluation was to determine her ability to function as a parent, not her relationship with Joshua specifically. The evaluation was conducted on May 21, 1999, approximately two years after DLF had been placed in the custody of the State. According to Dr. Thigpen, she and the defendant *161 actually discussed the defendant's relationship with DLF during the evaluation. We do not find that the trial court erred in concluding that the information gathered during the defendant's session with Dr. Thigpen was relevant in determining DLF's fate. These assignments of error are without merit.

CONCLUSION
For the foregoing reasons, the judgment of the trial court terminating all parental rights and obligations of Darla Phillips to DLF is affirmed. The trial court's certification of the minor child, DLF, for adoption is hereby affirmed.
AFFIRMED.
NOTES
[1] In its "Affidavit in Support of an Instanter Order," DSS alleged that the agency received a report that Darla Phillips was allowing ten people to reside with her and DLF in her small, two-bedroom trailer, in addition to fifteen cats and two dogs. DSS further alleged that "the house reeked with an odor associated with animal urine and feces and there was an excessive number of roaches in every room of the trailer."
[2] Paul, the child's biological father, executed a voluntary act of surrender of his parental rights prior to the hearing.
[3] Family Matters is described as an agency designed to provide individualized parenting sessions, connect clients to resources within the community and observe family visits.