Judgment rendered January 25, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,859-JAC

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA
IN THE INTEREST OF
A.L. and K.L.

* * * * *

Appealed from the
Fifth Judicial District Court for the
Parish of Richland, Louisiana
Trial Court No. J-2020-26

Honorable Clay Hamilton, Judge

* * * * *

| | |
|---|---|
| CINC APPELLATE PROJECT<br>By: Douglas Lee Harville | Counsel for Appellant,<br>F.H., Mother |
| SHIRLEY GUILLORY GEE<br>Assistant District Attorney | Counsel for Appellee,<br>State of Louisiana |
| LEGAL AID OF NORTH LOUISIANA<br>By: Elizabeth Clement Brown | Counsel for Children,<br>A.L. and K.L. |
| STATE OF LOUISIANA, DCFS<br>By: Keesha Mason Bordelon | Counsel for Appellee,<br>State of Louisiana, DCFS |
| VARHONDA EUGENIA BURRELL | Counsel for D.L., Father |

* * * * *

Before STONE, COX, and HUNTER, JJ.

HUNTER, J., dissents with written reasons.

**STONE, J.**

This appeal arises from the Richmond Parish Juvenile Court, the Honorable Clay Hamilton presiding. F.H., the mother of the minor children, A.L. (born May 4, 2017) and K.L. (born August 13, 2018), appeals a judgment terminating her parental rights. The trial court found F.H.'s failure to address her mental health issue as required in the case plan demonstrated her inability or unwillingness to provide proper care for the children in a safe environment. For the following reasons, we affirm.

## FACTS

On September 8, 2020, the Louisiana Department of Children and Family Services (the "department") received a report of neglect regarding the minor children, A.L. (40 months old) and K.L. (23 months old), whose parents were listed as F.H. and D.L. In its affidavit in support of an instanter order placing the children in state custody, the department stated that F.H. had been transported to Longleaf Mental Hospital under a Physician's Emergency Certificate after she began seeing demons, experiencing auditory hallucinations, and threatening to kill herself and her children. The trial court entered an instanter order placing A.L. and K.L. in the custody of the state.

On October 19, 2020, the department filed a petition alleging AL and K.L. were children in need of care due to neglect. The department alleged F.H. had been diagnosed with Schizophrenia, but had refused to take her prescribed medication, and that she had tested positive for methamphetamine and marijuana when admitted to Longleaf. The department alleged A.L. and K.L. had suffered neglect due to F.H.'s failure to take the medication prescribed for her mental condition and her drug

abuse, which constituted an unreasonable failure to provide the care necessary for the health and safety of the children. The trial court found the children were in need of care and maintained custody with the state through the department.

On October 22, 2020, the department submitted a case plan, which was approved by the trial court. The plan stated A.L. and K.L. had been placed in foster care with a family friend and the case goal was reunification. The case plan required F.H. to: (1) maintain safe housing with adequate space for the children; (2) to have sufficient legal income to meet the needs of the children and provide the department case worker, Jennifer Goldman ("Goldman"), with proof of such income each month; (3) complete mental health and substance abuse assessments and complete recommended treatment, submit to random drug screens, maintain sobriety with no positive drug screens for at least six months; and (4) attend parenting classes.

On March 3, 2021, the department filed a case report stating F.H. was refusing to take her psychiatric medication and was smoking marijuana. The department stated that although F.H.'s residence in Rayville was adequate, the agency learned she had begun living in Monroe, but she did not provide the address to the department worker. The agency reported F.H. had completed the intensive outpatient treatment program at the Northeast Louisiana Substance abuse facility, but had not attended her mandatory Narcotics Anonymous meetings.

Later in March, F.H. fired a handgun outside of her residence in Rayville, located next door to the home of her children and their foster parent. F.H. then entered the foster residence with a loaded gun in hand and threatened to kill the foster parent and the children. In April 2021, the

3

department responded with a motion for a judicial determination that reunification efforts were not required, and in October 2021, filed a petition for termination of parental rights.[1] Goldman and F.H. testified at the first hearing. Thereupon, the trial court granted the motion obviating required reunification efforts and ordered the case plan goal to be changed to adoption in the best interest of the children. At the later hearing regarding termination of parental rights, Goldman provided basically the same testimony that she did in the earlier hearing on the motion for declaration that reunification efforts are not required; however, F.H. did not testify in the latter hearing. In the following paragraphs, the testimony from these two hearings is summarized *in globo.*

F.H. testified that, at the time of the instanter order originally removing the children from her custody, she was already under a family in need of care case plan. She denied memory of the September 2020 event prompting the entry of the instanter order, wherein she experienced hallucinations and threatened to murder her children and commit suicide. F.H. also initially denied her March 2021 incident wherein she illegally fired a gun and, with gun in hand, threatened to murder the foster parent and the children; however, upon having the fact that the incident was videotaped called to her attention, she shifted to denying memory of the event and speculated that she must have been "roofied."[2] Similarly, F.H. at first denied

---

[1] The legal standards for termination of parental rights and obviation of required reunification efforts are exactly the same.

[2] F.H. pled guilty as charged in relation to the gun/murder threat incident a couple months after this testimony.

Also, Goldman testified that on the night of the gun/murder threat incident, F.H. was standing in the road screaming and cursing about her brother (allegedly) having stolen and wrecked her car; however, her car was right there and had not been wrecked.

that she had failed to take her psychiatric medications. However, upon realizing that pharmacy records showed she had not filled the prescriptions, F.H. admitted to not taking her medications. She then shifted to blaming her failure on her lack of a car, but then admitted that her social worker would have brought the medication to her if she had asked. F.H. admitted that she has been diagnosed with schizophrenia, but contends that the diagnosis is incorrect; she insists that she is "normal." She admitted to having a criminal record for possession of marijuana.

Goldman testified that, under the case plan, she met with F.H. individually once per month, and twice per month to chaperone F.H.'s visitation with the children. During the visitations, Goldman observed that the younger child, K.L., is bonded with F.H. Contrarily, the older child, A.L., is not bonded with F.H. — but is bonded with the foster parent. At the time she was taken into state custody, K.L. had not received any vaccinations despite being nearly 2 years old. Goldman noted that F.H. largely ignored A.L. (who has a host of serious medical conditions including seizures, diabetes, hydrocephalus, cerebral palsy and the inability to speak or walk) in favor of K.L., to whom F.H. referred as her "normal child." Goldman stated that, at the time the children were removed in fall 2020, they were "severely underweight" and malnourished. In the nine months following removal, A.L. gained 9 pounds; she went from 21 pounds to 30 pounds. This reflects nearly a 50% increase in body weight from the 40th month of A.L.'s life to the 49th month of her life. Goldman further stated that, at the time of removal, A.L.'s health was deteriorating and F.H. was failing to bring A.L. to her prescribed physical therapy and occupational therapy. Notably, F.H. objected to the children eating food provided by the

5

foster parent on supposed nutritional grounds, despite the diet having been prescribed by a physician.

In her conversations with Goldman, F.H. denied her diagnosis of schizophrenia, denied needing her psychiatric medications, and claimed to have been managing well without them. However, F.H. failed to attend most of her required mental health counseling sessions. Additionally, F.H. failed to comply with her substance abuse rehabilitation program by failing to attend Narcotics Anonymous meetings and by testing positive for marijuana on two occasions. On the positive side, she did complete intensive outpatient treatment; one of her three drug tests were negative, and she attended parenting classes as required up until the March 2021, incident wherein she illegally fired a gun and threatened to murder the foster parent and the children with gun in hand, whereupon she was expelled from the parenting program. That incident additionally prompted the department to change the case goal from reunification of F.H. with the children to the foster parent's adoption of the children. F.H. discontinued her case plan at that time. (In late October 2021, F.H. pled guilty as charged to aggravated assault with a firearm and unlawful use of a weapon in connection with the March 2021, incident and was, in effect, given concurrent one-year sentences of hard labor, with an additional three years suspended and subject to supervised probation).

Goldman's testimony indicates that the children are bonding with the foster parent, are being well fed in the foster home, having their medical needs met, and are pursuing age appropriate education. Finally, she also testified that the only alleged father was incarcerated as of the time of the hearing.

6

The department's petition for the termination of parental rights asserted the same factual basis as the motion for declaration that reunification efforts are not required, i.e., that F.H. had failed to complete her case plan, refused to take her psychiatric medication as prescribed, and credibly threatened to murder the children and foster parent with a firearm. As previously mentioned, Goldman's testimony at the hearing to terminate parental rights is without any significant difference from her testimony in the hearing on the motion for declaration that reunification efforts are not required. The only major additions to the department's evidence were the sentencing minutes from F.H.'s criminal case relating to the March 2021 incident and a search certificate from the putative father registry.

In April 2022, the trial court rendered a judgment terminating the parental rights of F.H. and the father, D.L.  The trial court based that judgment on La. Ch.C. art. 1015(6), finding the children have been in the custody of the department for more than one year and cannot be safely returned to either parent because neither the mother nor the father had substantially completed the case plan or shown significant measurable progress.  F.H. appeals the judgment, urging that the trial court erred manifestly in finding that the evidence satisfied the applicable legal standards in finding reunification efforts were not required and in terminating her parental rights to the children.

## DISCUSSION

In particular, F.H. argues that the department failed to prove by clear and convincing evidence that she had engaged in egregious conduct or that there was no reasonable likelihood of improvement in her condition in the near future.

7

**Law**

In a child in need of care proceeding, when a child is in the custody of the state, the department may file a motion for a judicial determination that efforts to unify the parent and child are not required. La. Ch.C. art. 672.1(A). The department has the burden of demonstrating by clear and convincing evidence that reunification efforts are not required, considering the health and safety of the child and the child's need for permanency. La. Ch.C. art. 672.1(B). "Reunification efforts are not required if…the parent has subjected the child to egregious conduct or conditions, including but not limited to *any grounds for certification for adoption pursuant to article 1015.*" La. Ch.C. art. 672.1(C)(1). (Emphasis added).

La. Ch.C. art. 1015(6) includes among the grounds for certifying an adoption (i.e., termination of parental rights) the following:

> [The elapse of at least one year] since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

This provision sets forth five essential elements for the termination of parental rights *and* determination that reunification efforts are unnecessary: (1) the removal of the child from the parent's custody pursuant to a court order; (2) the passage of at least one year thereafter without reunification; (3) the department provision of a court-approved case plan to the parent; (4) failure of the parent to substantially comply with the case plan; and (5) the absence of a "reasonable expectation of significant improvement in the

8

parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home." To that end, in relevant part, La. Ch.C. art. 1036(D) provides:

> D. Under Article 1015(6), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:
>
> (1) Any…mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm…based upon an established pattern of behavior.
> …
>  (3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child …based upon an established pattern of behavior.

Additionally, (6) the adoption must be in the best interest of the child for parental rights to be terminated. La. Ch.C. arts. 1037(B) and 1039(A).

The state bears the burden of proving these elements by clear and convincing evidence. La. Ch.C. art. 1035. A trial court's factual findings underlying a judgment terminating parental rights are subject to manifest error review on appeal. *State ex rel. DLF. v. Phillips*, 34,645 (La. App. 2 Cir. 4/4/01), 785 So.2d 155.

**Analysis**

The first three elements of La. Ch.C. Art. 1015(6) are unquestionably established: (1) the removal of the children from the parent's custody pursuant to a court order; (2) the passage of at least one year thereafter without reunification; (3) the department provision of a court-approved case plan to the parent. These elements are clearly proved and do not merit discussion.

Conversely, the latter two elements do merit discussion: (4) failure of the parent to substantially comply with the case plan; and (5) the absence of a "reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home."

F.H. and her children were already under a *family* in need of case plan when F.H. – because she was hallucinating and threatening to kill herself and her children – was forced into hospitalization and diagnosed with schizophrenia. Thereupon, her children were taken from her and placed in state custody (foster care) pursuant to *child* in need of care proceedings. With the goal of reuniting the children with F.H., the department filed a case plan designed to provide F.H. with the resources to establish her fitness to parent toddlers. The trial court approved the plan, and the department assisted F.H. to help her comply with the requirements of the plan. Nonetheless, F.H. denied her schizophrenia, refused to take her psychiatric medications, refused to maintain attendance of her mental health counseling sessions, and continued smoking marijuana as an admitted form of "self-medication." While under the case plan, F.H. went outside to her back porch (of her home next door to the foster residence) and illegally fired a gun. She then went to the foster residence with loaded gun in hand and threatened to kill the foster parent and her own children. During the incident, she also stood in the road screaming and cursing about her car having been stolen and wrecked even though it was parked there in plain view and was not wrecked. Three months later, law enforcement arrested F.H. for these acts; the delay was due to their inability to find F.H. despite prompt reporting of the incident.

She pled guilty to illegal use of a weapon and aggravated assault with a firearm. Furthermore, her testimony at the hearing corroborated the aforementioned indicia of her lack of fitness to parent her children. She denied memory of the two occasions on which she threatened to murder her children (in the first of which she also threatened suicide, and in the latter, she threatened to kill the foster parent as well) and, multiple times, she changed her story on the stand when confronted with objective proof that she was incorrect in her testimony. F.H.'s testimony, overall, demonstrated her lack of candor, her refusal to acknowledge that she is schizophrenic, and refusal to take responsibility for her non-compliance with her case plan.

These facts clearly establish that F.H. substantially failed to comply with her case plan and is a mortal danger to her children. They also amply prove that there is no reasonable expectation of significant improvement in F.H.'s condition in the near future, especially in light of La. Ch.C. art. 1036(D)(1), *supra*. Accordingly, the latter two elements of La. Ch.C. art. 1015(6) are clearly and convincingly established.

Finally, we hold that adoption is in the best interest of the children. Their interest in not being in the custody of a drug abusing, unmedicated, schizophrenic who severely underfed them, neglected their medical needs, *and has twice threatened to murder them* is paramount. F.H. is incarcerated and so is the childrens' father. The children are flourishing in the foster home and are bonded with the foster parent. The childrens' needs are being well satisfied there, and their need for safety, permanency, and stability makes adoption the course of action that is in their best interest.

## CONCLUSION

For the reasons stated herein, the judgments of the trial court are

**AFFIRMED**.  All costs of this appeal are taxed to the appellant.

**HUNTER, J., dissenting.**

Considering the best interest of the children with the mother's interest in maintaining a meaningful relationship with her children, I conclude the trial court's judgments finding reunification efforts were not required and terminating the parental rights of F.H. must be reversed. Therefore, I respectfully dissent.

When the state seeks to terminate parental rights, it bears the burden of establishing each element of a ground for termination of parental rights under La. Ch. C. art. 1015 by clear and convincing evidence. La. Ch. C. art. 1035; *State ex rel. B.H. v. A.H.*, 42,864, (La. App. 2 Cir. 10/24/07), 968 So. 2d 881; *State ex rel. S.C.M.*, 43,441 (La. App. 2 Cir. 6/4/08), 986 So. 2d 875. This heightened burden of proof requires the state to show not only that the existence of the fact sought to be established is more probable than not, but that the fact is highly probable or more certain. *State ex rel. B.H., supra*; *Hines v. Williams*, 567 So. 2d 1139 (La. App. 2 Cir.), *writ denied*, 571 So. 2d 653 (1990). Failure of the state to prove any of the statutory elements for termination of parental rights is a failure of the state to meet its burden of proof and termination of parental rights cannot be ordered. *State in Interest of JML*, 540 So. 2d 124 (La. App. 3 Cir. 1989).

Although there are various grounds for termination of parental rights set forth in La. Ch. C. art. 1015, only one ground need be established. *State ex rel. SNW v. Mitchell*, 01-2128 (La. 11/28/01), 800 So. 2d 809. Once a ground for termination has been established, the judge may terminate parental rights if the termination is in the best interest of the child. La. Ch. C. art. 1039. The trial court's factual findings, including the finding that a parent is unfit, and there is no reasonable expectation of reformation, will

1

not be set aside in the absence of manifest error. *State ex rel. B.H., supra*; *State ex rel. D.L.F. v. Phillips*, 34,645 (La. App. 2 Cir. 4/4/01), 785 So. 2d 155.

A parent has a constitutionally protected liberty interest in establishing and maintaining a meaningful relationship with his or her children. *State in the Interest of A.C.*, 93-1125 (La. 1/27/94), 643 So. 2d 719. Congruent with the parental interest, the state has a legitimate interest in limiting or terminating parental rights under certain conditions. State in Interest of A.C., supra. In an involuntary termination of parental rights proceeding, courts must proceed with care and caution, as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens. *State ex rel. J.A.*, 99-2905 (La. 1/12/00), 752 So. 2d 806. Applying this delicate balancing test with an eye toward the best interest of the child coupled with ongoing efforts of the parent and potential foster parent, we now plumb the depths of the current matter before the court.

In the present case, the record shows F.H. was making some progress in complying with the requirements of her case plan. Her mental illness was the primary obstacle to her efforts to complete her case plan. Despite her mental health issues and past substance abuse, F.H. was able to maintain employment, provide food and clothing for A.L. and K.L., participate in visits with her children and attend parenting classes. However, her efforts were interrupted by her incarceration as a result of her guilty pleas to aggravated assault with a firearm and illegal use of a weapon. These charges resulted from the incident in March 2021, when she threatened her children and their foster parent with violence while armed with a handgun.

In her brief, F.H. contends this incident occurred within 70 days of a change in her medication, which included the potential side effects of suicidal or homicidal ideations. As explained by the state caseworker, Jennifer Goldman, DCFS chose to use this incident absent any further rehabilitative efforts as justification to cease services meant to prepare F.H. for reunification with her children. We find this action by DCFS to be in error.

The record shows F.H. was making serious efforts to comply with the case plan and had completed an outpatient substance abuse program. This progress was interrupted by her incarceration which was in effect at the time of the hearing on termination of parental rights in February 2022. As a result, the trial court relied on outdated information in determining whether F.H. would be able to make substantial progress in improving her condition.

However, the assessment of whether there has been substantial compliance with the case plan requirements and whether there is a reasonable expectation of significant improvement in the parent's condition or conduct in the near future *should be reevaluated after her release* from prison. This approach would allow F.H. the opportunity to demonstrate her ability to address her mental health issue and complete the other case plan requirements of employment, housing and sobriety. Such a reevaluation should include reasonable efforts by DCFS to provide services to F.H. for the purpose of assisting her to complete the requirements of a case plan with the goal of reunification with her children.

Because the trial court was limited to considering the information as to F.H.'s activities prior to her incarceration in June 2021, the evidence considered at the termination of parental rights hearing was inadequate to

3

support the trial court's determination F.H. had not substantially complied with the case plan and there was no reasonable expectation of significant improvement in her condition in the future. Thus, I must conclude the trial court erred in terminating the parental rights of F.H. on the basis of this insufficient evidence.

Based on this conclusion, I would also reverse the judgment finding reunification efforts were no longer required and changing the case goal to adoption in order to give F.H. a fair chance at demonstrating her ability to take the steps necessary to work toward the goal of reunification. This matter should be remanded to provide all concerned with an opportunity to reevaluate the current situation of F.H. and the foster parent, with an eye toward the paramount concern of protecting the best interests of the children.

Reunification of a parent with a child **and** termination of parental rights are both significant acts due to the repercussions on the child. Weighing both those outcomes individually and collectively with the goal of furnishing and perpetuating an atmosphere conducive to the best interest of the children is the balancing test the lower court should administer.

For the foregoing reasons, I would reverse the trial court's judgments granting the motion for a determination that reunification efforts are not required and terminating the parental rights of the mother, F.H., with regard to the minor children, A.L. and K.L., and remand this matter for further proceedings.

4